# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

JSDC- BALTIMORE
'25 JUL 23 PM3:42

**DONNA J. SATTERLEE, PH.D**.

**Plaintiff**

v.

**UNIVERSITY OF MARYLAND EASTERN SHORE,**
**HEIDI ANDERSON,**
**RONDALL ALLEN,**
**MOSES KAIRO,**
**GRACE NAMWAMBA,**
**JASON CASARES,**
**ALEXANDRA GINTA MARTIN**

**Defendants**

**COMPLAINT AND JURY TRIAL DEMAND**

Case No. SAG 25-cv-2403

1

# I.  PARTIES

1.  Plaintiff Dr. Donna J. Satterlee is a resident of Princess Anne, Maryland. She was employed as a tenured associate professor at the University of Maryland Eastern Shore until she was unlawfully terminated in 2024.

2.  Defendant 1 is the University of Maryland Eastern Shore, a higher education institution organized under the laws of the State of Maryland within the University System of Maryland based in Princess Anne, MD, with its main campus at 11868 College Backbone Rd., Academic Oval, JT Williams Hall, Princess Anne, MD 21853.

3.  Defendant 2 is Heidi Anderson, president of the University of Maryland Eastern Shore. She is a resident of Princess Anne, MD, and her principal place of work is at 11868 College Backbone Rd., Academic Oval, JT Williams Hall, 2nd Floor, Princess Anne, MD, 21853.

4.  Defendant 3 is Rondall Allen, provost of the University of Maryland Eastern Shore. He is a resident of Salisbury, MD and works at the above location.

5.  Defendant 4 is Moses Kairo, the dean of the School of Agriculture and Natural Sciences. He is a resident of MD.

6.  Defendant 5 is Grace Namwamba, the chair of the Department of Human Ecology at UMES. She is a resident of MD.

7.  Defendant 6 is Jason Casares, the director of the Office of Institutional Equity at UMES. He is a resident of MD.

8.  Defendant 7 is Alexandra Ginta Martin, the associate director of the Office of Institutional Equity at UMES. She is a resident of MD.

# II.  JURISDICTION

9. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17, 42 U.S.C. § 1983, 1985, and 1988.

10. This court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1337 and 1343. This court has jurisdiction to award the damages prayed for pursuant to 28 U.S.C. § 1343; and the declaratory relief pleaded under 28 U.S.C. §§ 2201 and §§ 2202. This court has authority to award costs and expert fees under 42 U.S.C. § 1988.

11. Plaintiff's state law claims arise under the laws and constitution of the State of Maryland over which this Court may exercise supplemental jurisdiction, pursuant to 28 U.S.C. §1367.

12. Venue is proper in this district court pursuant to 28 U.S.C. § 1391(b) because the defendants are residents herein and all the acts described in this Complaint occurred in this district.

13. Plaintiff has fulfilled all the conditions necessary under Title VII for filing this complaint and has exhausted all her administrative remedies.


## III. FACTUAL BACKGROUND

14. Dr. Donna Satterlee commenced employment at UMES on August 26, 2002, as a full-time Visiting Lecturer in the Department of Human Ecology in the School of Agricultural and Natural Sciences.

15. Over the course of her employment at UMES, Dr. Satterlee established a reputation as an award-winning, highly student-centric, and academically rigorous teacher and scholar. She was regarded as warm, engaging, and highly collegial throughout the 22 years of work at UMES.

16. In 2019, Dr. Satterlee was awarded tenure in the Department and held the rank of associate professor.

17. Aside from being a popular teacher, Dr. Satterlee was also well-regarded in her professional discipline and went on to hold several influential positions in the field.

18. Moses Kairo, a former Kenyan national, became the dean of the School of Agricultural and Natural Sciences at UMES in 2012. He exhibited a distinct preference for African nationals in hiring for positions within the school.

19. Grace Namwamba, also a former Kenyan national, became the chair of the Department of Human Ecology in or about 2014. She is the primary supervisor for faculty employed in the department and conducts annual performance appraisals, administers workloads, and other related matters. Namwamba reports to Moses Kairo.

20. Grace Namwamba and Moses Kairo are believed to be former schoolmates in Kenya.

21. Heidi Anderson was appointed the president of UMES in 2018 under questionable circumstances. Her hiring was at the behest of Jay Perman, Chancellor of the University System of Maryland, based on a pre-existing relationship that was not disclosed at the time. It was discovered after her appointment because Anderson frequently boasted about her closeness to the higher-ups at USM to convey that she was protected. Anderson's presidency has been severely problematic for UMES: a calamitous drop in student enrollment, scandals, whistleblower complaints, allegations of misconduct, and adverse actions by accreditors and regulatory bodies including the US Department of Education's Office of Civil Rights. UMES lost its R2 designation in the Carnegie Classification of US universities under Heidi Anderson's leadership.

22. Heidi Anderson possesses overall responsibility for running the university and is the final arbiter of disciplinary actions against faculty at UMES.

23. Heidi Anderson has expressed a preference for African-Americans in hiring of faculty and staff and the upper-administration of the university exhibits a marked bias against

Caucasian and Asian citizens. Important roles and career advancement opportunities are assigned on a disproportionately high basis to African-Americans, who also appear to receive higher pay irrespective of qualifications or actual work performance. Black faculty and administrators are paid vastly higher than others of similar or better qualifications. Heidi Anderson has instituted a two-tier system of racial preferences discriminating against White and Asian faculty who are given more and less-desirable work but significantly lower pay.

24. Heidi Anderson's two-tiered system is invidiously and maliciously organized racism: it exploits White and Asian faculty's work and transfers credit and income generated from that work to selected Blacks in the form of inflated pay and bribes. White and Asian faculty are treated as second-class citizens at UMES.

25. Dr. Donna Satterlee was one of the leaders of a campus effort to achieve non-discriminatory pay and promotion opportunities for all employees at UMES. She advocated for a salary study to publish data showing discrimination in salaries paid at UMES based on race and gender. This made her a target of Heidi Anderson and the administration.

26. Rondall Allen is the provost of UMES. He is a pharmacist and does not possess a Ph.D. or other research degree but refers to himself as "Dr. Allen."

27. Rondall Allen administers the operation of faculty policies and rules in addition to the Faculty Handbook and the University Catalog.

28. Jason Casares is the director of the Office of Institutional Equity at UMES. He is the Title IX Coordinator and is responsible for oversight of anti-discrimination and harassment laws and policies.

29. Casares's employment at UMES was problematic from the inception because he came in under a cloud of well-publicized accusations of sexual assault against him at a previous

5

institution. According to the facts known to the faculty at the time, he quit his prior position facing the prospect of legal action for sexual assault. Media reports indicated that there were complaints from employees of that university that he had abused university processes.

30. Alexandra Ginta Martin is the associate director of the Office of Institutional Equity at UMES. She has no apparent qualifications or experience for that role and has been the subject of numerous complaints by faculty and staff. She has an extremely dependent relationship with Jason Casares.

31. Jason Casares and Alexandra Martin share a close relationship with Heidi Anderson and Rondall Allen. Their primary function appears to be to manufacture false complaints, intimidate and terminate any faculty or staff who dare to criticize any aspect of Anderson or Allen's decisions by abusing the university's investigatory processes and policies.

32. After Grace Namwamba took up her position as the Chair of the Department of Human Ecology, she began to target Dr. Satterlee for hostile and discriminatory treatment.

33. Grace Namwamba exhibited a discriminatory preference for Black faculty by giving them higher pay and less work than non-Black faculty.

34. Dr. Satterlee was frequently assigned work at the last minute, given teaching allocations without adequate time for preparation, and was assigned double the work of African or African-American faculty. In one instance, Dr. Satterlee was instructed by Dr. Namwamba to create a master's degree program in two days. In a normal university, this type of work would be done by a group of faculty taking at least one year. This egregiously onerous assignment was on top of Satterlee's regular workload which was already heavier than any other member of the department. After Dr. Satterlee worked without rest to complete the assignment, Dr. Namwamba took her work product and stole the credit and completely shut out Dr. Satterlee.

6

35. Grace Namwamba's last-minute work dumps on Dr. Satterlee were extremely cunning and calculated to cause maximum damage. Dr. Namwamba invariably imposed last-minute work demands when Dr. Satterlee's regular workload was at the peak of the semester cycle: for instance, during the peak of advising students, or grading exams. Dr. Namwamba used workload allocation for punitive purposes in a malicious manner to harm Dr. Satterlee. As one example, in November, 2023, two weeks before the end of the semester, Dr. Namwamba tasked Satterlee with amending and updating the department's tenure policy document with a one-week deadline. At the same time, Satterlee was also tasked with putting two classes online. Dr. Namwamba knew that Satterlee was already extremely busy with preparing her dossier for promotion and wanted to damage her application.

36. Grace Namwamba consistently exhibited a hostile tone and demeanor and appeared to be seeking an excuse to terminate Dr. Satterlee's employment to hire a preferred African or African-American candidate. She was given unsanitary workspaces, the worst office, and unsafe work conditions after her classroom and office flooded. There was mold in her office, sticky classroom flooring, whereas other Black faculty were given preferential treatment. Dr. Satterlee complained about unhygienic work conditions being given to her on several occasions including January 2023.

37. Dr. Satterlee was the lowest paid faculty member in her department.

38. On or about April 2019, Grace Namwamba herself directly informed Dr. Satterlee that her pay was the lowest in the department.

39. Dr. Satterlee was extremely distressed to learn this as she had better credentials and qualifications than Dr. Namwamba.

40. The knowledge that she was the lowest paid faculty member was especially galling because Dr. Satterlee had gone above and beyond the call of duty to save the department and its

degree programs from collapse in enrollment and quality. She was instrumental in securing articulation agreements with nearby community colleges, actively marketing degree programs to key constituencies, building the discipline's reputation in the region – all leadership tasks that Grace Namwamba miserably failed to do with severe consequences for the university as demonstrated by plummeting enrollment, abysmal retention, and graduation outcomes.

41. Dr. Satterlee brought several basic leadership failures and lack of essential minimal competence by Grace Namwamba to light to improve the experience of students and faculty. This earned her the ire of Namwamba and Kairo. For instance, on September 12, 2023, Dr. Satterlee emailed Namwamba to alert her to several major problems with classrooms. That same month, she emailed Dr. Namwamba to ask her to provide basic marketing and promotional materials for the department's programs that were long overdue for recruiting students.

42. Dr. Satterlee repeatedly asked for her pay to be adjusted to bring it in line with other faculty of similar rank but was rebuffed.

43. Dr. Satterlee was also concerned that Namwamba was not adhering to the University System of Maryland rules and procedures related to student attendance and academic performance and raised these matters with Dr. Namwamba. Dr. Satterlee repeatedly emphasized the need to adhere to the University Catalog which was a contract with the students and ensure that student learning outcomes were met.

44. Critically, Dr. Namwamba had extremely poor work competencies and skills and appeared incapable of writing in English at the level required of a university professor. Dr. Satterlee pointed out numerous writing errors and badly prepared documents with a view to helping

Dr. Namwamba improve her work product on several occasions. These attempts at helping Namwamba were met with overt hostility.

45. Dr. Satterlee raised these issues with Dr. Namwamba on numerous occasions including during the Fall semester of 2021. Dr. Namwamba responded in a highly intimidatory manner causing extreme anxiety and leading Dr. Satterlee to make a note to report the matter to UMES Human Resources to obtain a protective order against Namwamba.

46. On November 2, 2020, Dr. Satterlee met with Jason Casares and Alexandra Martin to make a complaint about bullying and hostile work environment created by Dr. Grace Namwamba. During the meeting and the subsequent events, it was evident that Casares and Martin were absolutely biased against Dr. Satterlee and completely in the pockets of the UMES administration.

47. Shortly after this meeting, Dr. Namwamba's behavior toward Dr. Satterlee became more antagonistic and discriminatory.

48. In November 2021, Dr. Satterlee raised her concerns about Dr. Namwamba's hostile behavior with the then provost Dr. Nancy Niemi. Like Dr. Satterlee, Dr. Niemi is also a Caucasian woman, and she expressed support and agreed that it would be unwise for Dr. Satterlee to meet with Dr. Namwamba alone. Dr. Niemi was also pushed out of UMES by Heidi Anderson for seeking to uphold academic standards and fair workplace practices.

49. Dr. Satterlee brought her complaints about Grace Namwamba to the attention of Gertrude Hairston, director of Human Resources, and Matthew Taylor, General Counsel.

50. In November 2021, Dr. Satterlee emailed Alexandra Martin and Jason Casares a complaint about Namwamba's hostile behavior and intimidation.

51. On September 26, 2023, Dr. Satterlee emailed Jason Casares and informed him about disrespectful behavior by Namwamba. Casares likely informed Namwamba.

52. On October 3, 2023, Dr. Satterlee emailed Alexandra Ginta Martin detailing trauma induced by Namwamba. The email stated, in part:

> "I am having enough trouble right now trying to resolve the assignment that is due on the 20th, since the topic of "trauma" is bringing up the trauma I had to deal with from Dr. Namwamba a year ago. As a previous EMT where we talked about critical stress incidents, along with triggers, I am acting like a classic case. The increase in cortisol can cause serious health problems, and I am dealing with a PHI at the moment, and am headed to the doctor later this morning. The date was set up more than a month ago. The ageism and racism from her right now is enough to deal with right now. She is trying to get me to retire. I am not yet ready to do so, although I have thought about when seriously, which will not be public knowledge until I determine a date, which is my perogative. I got a rather nasty response when I removed a tentative retirement date from the office that deals with that, and was told that I need to give adequate time when I have a date for retirement, which I plan to do. I just don't have a date yet. I have tenure."

53. During several occasions in 2022, including meetings in October and November, Dr. Satterlee raised the issue of pay discrimination and disproportionately high workload with Grace Namwamba.

54. Dr. Namwamba's behavior turned worse with every petty opportunity for retaliation being utilized to harass Dr. Satterlee. For instance, a simple request to confirm that Dr Satterlee taught 6 credits of courses was not honored by Dr. Namwamba despite several requests by Dr. Satterlee in June 2023. This was a costless request that would have taken a couple of minutes for Dr. Namwamba to do but she refused to do it out of spite knowing that the

confirmation letter was essential for Dr. Satterlee to maintain her teaching certification. Eventually, Dr. Satterlee had to contact Gertrude Hairston in HR on June 26, 2023, for a solution to the impasse.

55. Dr. Namwamba deliberately withheld signatures on documents that were important to Dr. Satterlee to adversely impact her professional aspirations. For instance, signed performance evaluations for at least four years were not sent by Dr. Namwamba to prevent Dr. Satterlee from being able to use them in her promotion application.

56. Namwamba, Kairo, Allen, and Anderson appear to have been angered by these complaints as their primary concern was the maintenance of a façade of student enrollment. This was essential to take high salaries for themselves and their associates by conveying a false narrative that the university was sustainable.

57. Kairo, Allen, and Anderson signaled their strong support for Namwamba publicly at Faculty Assembly and Senate meetings, paid her substantially more than similar professionals at other universities and behaved in a hostile manner toward Dr. Satterlee. There was no ambiguity that they were one alliance, and Dr. Satterlee was left in no doubt that there would be no recourse for any complaints against Namwamba at UMES.

58. For instance, Dr. Satterlee emailed Rondall Allen on January 23, 2023 to request a meeting to raise concerns about Namwamba but was rebuffed.

59. On July 6, 2023, Heidi Anderson emailed Dr. Satterlee asking "When are you scheduled to retire?". This was in response to an email from Dr. Satterlee communicating concerns about Namwamba and inquiring about the status of the swimming pool. Heidi Anderson's keenness to get rid of Dr. Satterlee is evident in the email.

60. Indeed, the Heidi Anderson Administration's posture towards non-Black faculty and staff was barely concealed hostility. It was an established practice to pay non-Blacks less than

Blacks, not include them in valuable opportunities, and only exploit their work for personal gain of the select few who were close to the university administration.

61. Dr. Satterlee was asked to do the bulk of the work to prepare Human Ecology degree programs for online offering. This required extensive additional work including obtaining specialized training on top of the already heavy workload assigned. Despite the unfairness, Dr. Satterlee worked hard to prepare the degree programs to be offered via online mode. However, when the approvals were obtained from regulatory bodies, Grace Namwamba deliberately ignored Dr. Satterlee's contributions and publicly praised others. For instance, in an email sent on January 27, 2023, Dr. Namwamba wrote: "I thank Dr. Clinton -Scott for leading the effort of writing an excellent academic program proposal and for her work as chair of the Human Ecology Curriculum Committee. I also thank all the faculty for their valuable contributions to the sections pertaining to their concentrations. Special thanks to Dr. Donna Long, Child Development, and Mr. Michael Kirtsos, Dietetics, for providing leadership for their concentrations."

62. Dr. Satterlee began to be concerned that UMES was turning into a diploma mill under Anderson, Kairo and Namwamba with no concern for academic standards.

63. As a person who really cares about her responsibilities as a professor and her duty to ensure student success, the hostile treatment by Dr. Namwamba and her allies caused serious health problems for Dr. Satterlee. She began to experience severe anxiety and panic attacks due to the hostile work environment.

64. In February 2024, the OIE placed Dr. Satterlee on administrative leave based on a complaint filed by Grace Namwamba that Dr. Satterlee had "bullied" her. The irony of the lowest-paid faculty member in the department "bullying" the all-powerful chair of the

department was apparently lost on the OIE staff responsible for this action: Jason Casares and Alexandra Ginta Martin.

65. In 2024, Dr. Satterlee applied for promotion to full professor.

66. Under UMES policy pertaining to promotion, Dr. Satterlee was fully qualified and more than satisfied the requirements for promotion. She received the requisite approvals from the faculty committee responsible for assessing applications and making recommendations. The committee wrote: "The Department of Human Ecology Ad Hoc committee has met as a whole and discussed Dr. Satterlee's application for promotion to the rank of Full Professor. Her accomplishments were rated as follows: teaching (46.6 points/50), research and scholarly activities (16 points/30), and service (19.6 points/20). Dr. Donna Satterlee's overall accomplishment was rated 82.2 points based on a maximum of 100. Based on the Human Ecology Department requirements, for all ranks, the candidate has to score a minimum of 70 points."

67. The committee "lauded" Dr. Satterlee's work in teaching, advising, and service and commended her for bringing in over $138,000 in grant funds to the university.

68. Despite this glowing committee recommendation, Grace Namwamba wrote a negative note on February 19, 2024, recommending that UMES deny promotion to Dr. Satterlee. The letter is pure opinion without any evidentiary basis and contradicts the overwhelming weight of evidence provided by Dr. Satterlee in her promotion dossier, over 15 years of performance evaluations, and the recommendation of a committee of experts appointed by UMES as part of its promotions process.

69. Typically, applicants for promotion at UMES are successful in their applications. Denial of promotion happens only in the rarest of rare cases.

70. Upon information and belief, Namwamba met with Moses Kairo, Rondall Allen and Heidi Anderson to campaign for denial of promotion. In May 2024, Rondall Allen wrote to Heidi Anderson recommending denial of promotion based on invented scores that had no evidentiary support or reasoning. Allen cited Satterlee's lack of research publications – a fake rationale considering that it was a teaching department with no research reputation or record.

71. Notably, Allen, Namwamba, Kairo, and Anderson all have absolutely no research records or stature whatsoever and would not be qualified to make any determinations about research quality. Applying their own words, none of them would merit their current positions.

72. Dr. Satterlee was denied promotion in 2024. She was the only applicant in that promotion cycle to be denied promotion from associate professor to full professor that year. As an example of the incompetence of the UMES Administration, the denial letter (which is mostly otiose) issued from the Provost's Office refers to Dr. Satterlee as "Dr. Scatterlee." It seems the overpaid administration cannot even spell-check such an important document.

73. During early 2024, Jason Casares and Alexandra Ginta Martin conducted a sham investigation into the manufactured allegation that Dr. Satterlee "bullied" her boss Dr. Namwamba.

74. On March 5, 2024, Dr. Satterlee categorically denied the allegations which had no evidentiary basis, were vague, and the investigation being conducted in violation of basic due process rights.

75. After abusing processes, manufacturing absolute lies, and violating all norms of due process, Jason Casares and Alexandra Martin issued a "Final Report" making an adverse finding against Dr. Satterlee.

76. On June 26, 2024, Dr. Satterlee rebutted the OIE's fake accusations and stated in part: "You have found me guilty of violating the UMES Workplace Bullying Policy. That policy is inapplicable. It prohibits "conduct that harms …an employee…and [is] not related to an employer's legitimate business interest." Essentially, the policy prohibits unjustifiable misconduct by the employer that is harmful to an employee. As a matter of logic, I cannot be punished under this policy for bullying Dr. Namwamba because she is my chair and my supervisor, and because she, as a full professor, outranks me (a mere associate professor). If as you have reminded me, Dr. Namwamba is my boss and can give me orders, how can I be in a position to "bully" her?

You have also found me to be "insubordinate" to Dr. Namwamba. If I fail to follow her lawful orders, Dr. Namwamba can seek to discipline me, but my "insubordination" does not fall within the purview of the Office of Inclusion and Equity. Mere disagreement does not equate to insubordination, and while I certainly disagree with Dr. Namwamba, I have not been insubordinate.

Of course, as you no doubt are aware, "insubordination" is not one of the enumerated grounds for terminating a tenured professor."

77. The OIE seems to have based its unlawful case on Dr. Satterlee having offered corrections to Dr. Namwamba's poor work. This does not constitute a violation of the policy and is not grounds for termination of employment. As the June 26 letter noted: "If a written communication from a department chair is "riddled with grammatical errors and misspellings", I have an obligation to call that to her attention and may do so without fear of reprisal, because, ultimately, we seek to teach students how to communicate WITHOUT

grammatical errors and misspellings. Ours is not a rigidly hierarchical institution, but rather a place of learning ..."

78. Critically, the OIE imposed a sanction of termination of employment based on this extremely thin case against Dr. Satterlee. The OIE has no authority to issue such a sanction against a tenured professor especially based on such a spurious case. The fact that such a draconian sanction was imposed only proves the point about discrimination and retaliation against Dr. Satterlee.

79. UMES did not follow the University System of Maryland processes to terminate the employment of a tenured professor. Instead, Heidi Anderson, Rondall Allen, Moses Kairo, Grace Namwamba, Jason Casares, and Alexandra Martin used the unlawful threat of termination in their "Final Report" to coerce Dr. Satterlee to "resign." This was nothing but constructive dismissal achieved unlawfully. Dr. Satterlee's employment ended on December 14, 2024 pursuant to a coerced and fraudulently induced "Transitional Terminal Leave Agreement."

80. Even before this "Final Report" from Jason Casares and Alexandra Martin imposing the sanction of termination was issued, Grace Namwamba sent an email to Moses Kairo on May 23, 2024 with the subject line "Updated - Dr Donna Satterlee's Termination recommendation."

81. This is months before the supposed impartial investigation that was to be the basis for any sanction by OIE was completed.

82. The existence of the May 23 email from Grace Namwamba proves that the OIE investigation by Jason Casares and Alexndra Martin was a fraud. The outcome was predetermined by Namwamba, Kairo, Anderson, Casares and Martin and the Final Report was just a scam.

83. UMES policy mandates impartiality and provides no role for a department chair to impose a punishment of termination prior to the conclusion of an investigation. Here Dr. Namwamba functioned as the complainant, judge, jury, and executioner.

84. In the May 23, email, Dr. Namwamba submitted an attached document to Dr. Moses Kairo asking for Dr. Satterlee to be terminated from her tenured position. This was done in blatant violation of the tenure and removal policies at UMES and USM.

85. On or about March 25, 2025, Dr. Satterlee filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on race and gender and retaliation.

86. On July 23, 2025, the EEOC issued a right to sue letter.

## IV. STATEMENT OF CLAIMS

### COUNT 1: Hostile Work Environment, Disparate Treatment, and Discrimination Based on Race and Sex in Violation of Title VII

87. The allegations in Paragraphs 13-86 above are incorporated by reference herein as if fully set out.

88. Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., it is unlawful for an employer to discriminate against any individual on account of her race or sex. It is also unlawful for an employer to engage in disparate treatment in the terms and conditions of employment based on an individual's race and sex.

89. UMES was fully aware of Dr. Satterlee's race (Caucasian) and sex (female).

90. After Dr. Satterlee began to question why she was the lowest paid member of her department and why female faculty and non-Black faculty were receiving lower pay and career opportunities, she was subjected to disparate treatment and unequal terms and conditions of employment including, but not restricted to, adverse employment actions for requesting fair treatment, removal from teaching classes she had taught previously, denial of basic facilities, unsanitary working conditions, new limitations on her participation within the Department, unusually high workloads, excessively onerous last-minute work demands, removal from online courses and programs she had developed, deliberate denial of credit due for completing challenging projects, refusal to sign key documents, stymying of career advancement opportunities, hostility, retaliation, false and manufactured allegations, a scam investigation, denial of merited promotion recommended by the university committee, unlawful termination by way of constructive dismissal, and deceptive and fraudulent coercion to sign a terminal leave agreement.

91. UMES intentionally and maliciously created a discriminatory and hostile work environment, in which, as detailed above, Dr. Satterlee's conditions of employment were negatively impacted and her rights were violated. Defendants caused severe and pervasive harm to unreasonably interfere with Dr. Satterlee's work and career.

92. Defendants treated Dr. Satterlee differently than her Caucasian peers and applied standards that were different to those applied to Black faculty thereby violating the statute.

93. Dr. Satterlee's annual salary was substantially lower than that of her Black peers including Charlene Harris, Bridget Clinton, Tierra Tivis, Carla Sewer, Sarah Acquah, and Virginia Zoumenou. Despite being better qualified and better performing, she was paid lower than these and other Black colleagues due to her race.

94. Dr. Satterlee was the only applicant who was denied promotion during the 2024 round of promotions. Defendants discriminated against her whilst promoting Black faculty including Patricia Goslee, Lakeisha Harris, and others who were of lower qualifications and performance.

95. Defendant's unlawful actions caused serious financial, emotional, health, and reputational harm to Dr. Satterlee. Defendant's intentional violations of the law will continue to cause economic and emotional harm and other compensable damages.

96. Defendant's unlawful employment practices described above were intentional and malicious and gained steam after Dr. Satterlee objected to the organized two-tier system of discrimination orchestrated by the Heidi Anderson administration against non-Black faculty.

97. Given that the unlawful practices, violations of Dr. Satterlee's legally protected rights, actual malice, deception, and fraud were intentional, ongoing, sustained, and systematically directed by Heidi Anderson, Grace Namwamba, Alexandra Martin, Jason Casares, Rondall Allen and Moses Kairo, this court should impose punitive damages.

**COUNT 2: Retaliatory Termination in Violation of Title VII.**

98. Plaintiff incorporates the allegations in paragraphs above by reference herein.

99. Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., it is unlawful for an employer to discriminate against any individual because the individual has opposed any practice, or because the individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statute.

100.    Plaintiff alerted Defendants to the hostile work environment, unlawful violations of her rights, bullying, and discrimination repeatedly including to Jason Casares and

Alexandra Martin starting in 2020. In addition, Plaintiff made specific complaints to Moses Kairo, Rondall Alen, and Heidi Anderson about Grace Namwamba but was ignored and her work conditions deteriorated. These individuals colluded with retaliatory animus to retaliate against the Plaintiff and terminate her employment in violation of the statute.

101.     By terminating her employment for complaining about race and sex discrimination, Defendants engaged in unlawful retaliation and violated the statute.

102.     The impact of the race and sex-based discrimination was pervasive and substantial.

103.     The unlawful employment practices were intentional and malicious and warrant the imposition of punitive damages.

104.     As a direct result of the Defendants' actions Plaintiff has suffered and will continue to suffer economic and non-economic harm and compensable damages.

105.     As demonstrated by Grace Namwamba's email to Moses Kairo to terminate Dr. Satterlee's tenured position even before the conclusion of the scam investigation, the termination was retaliatory and unlawful and there was no lawful, non-discriminatory or non-retaliatory justification for the termination of employment.

106.     Other UMES employees including but not limited to Robert Brown, Moses Kairo and others who are Black and had serious allegations of bullying against them were not fired. Plaintiff was targeted for firing because she was Caucasian and female.

**COUNT 3: Violation of Procedural Due Process under the Fifth through Fourteenth Amendment to the US Constitution**

107.     Plaintiff incorporates by reference the allegations above herein.

108.     Defendants engaged in deprivation of the Plaintiff's constitutionally protected property right in tenure in several ways including but not limited to denying the existence

20

of Plaintiff's property right in tenure, denying Plaintiff's the right to a procedures mandated by UMES and USM policies and rules governing the removal of tenured professors, not providing any rationale for the deprivation of her property right in tenure with sufficient specificity as to allow a meaningful response.

109.    Each of the Defendants knew that their actions were unlawful, that there was no legal basis to fire a tenured professor, and that they were violating UMES and USM policies protecting tenured professors. A reasonable person would have known that their egregious actions were illegal, but the Defendants engaged in their unlawful actions anyway for malicious purposes to violate Plaintiff's constitutionally protected rights.

110.    Defendants' actions have caused economic and non-economic damages and compensable damages as Plaintiff continues to suffer harm.

111.    Defendants' actions were an intentional and malicious violation of 42 U.S.C. § 1983.


**COUNT 4: Civil Conspiracy Under 42 U.S.C. § 1985.**


112.    Plaintiff incorporates and restates the allegations above.

113.    Defendants undertook and actively engaged in a conspiracy to violate Plaintiff's civil rights under the color of law.

114.    Defendants knew that Plaintiff had raised complaints about unlawful practices at UMES and formed an intention to terminate her employment because she was seen as a problem for their schemes.

115.    Defendants Heidi Anderson, Rondall Allen, Moses Kairo, Jason Casares, Grace Namwamba, and Alexandra Martin conspired to deprive Plaintiff of her constitutionally

protected property right to tenure without due process by manufacturing a fake and flimsy complaint bereft of any evidence. Each of the Defendants knew that the complaint was concocted and engaged in the conspiracy and took actions in furtherance including meetings, preparing fake allegations, documents, notes, abuses of processes, and stratagems to deprive Plaintiff of her constitutionally protected rights without due process of law. Defendants engaged in said activities knowing that their actions were unlawful or with reckless disregard.

116.    Each of the Defendants knew that USM and UMES mandated stringent due process protections prior to any adverse employment actions against tenured faculty.

117.    Defendants Casares and Martin manufactured fake statements, concocted lies, deceived and coerced Plaintiff, and abused processes in furtherance of the conspiracy. They imposed a sanction of termination although they knew they had no authority to impose such a sanction and that applicable rules gave them no such authority. They knew the complaint was fake and manufactured by themselves and Dr. Namwamba to counteract a prior valid complaint filed by Plaintiff.

118.    Defendant Namwamba undertook sustained actions including writing malicious false allegations, intimidating Plaintiff, orchestrating a denial of promotion and termination campaign in furtherance of the conspiracy to terminate Plaintiff's employment.

119.    Defendant Heidi Anderson enabled the conspirators' actions and signaled her role in the conspiracy by asking Plaintiff when she was retiring even though Plaintiff had not expressed any intention to retire.

120.    Defendant Heidi Anderson promoted Casares and Martin and awarded them vastly exaggerated salaries in exchange for their participation in conspiracies to violate Plaintiff's rights. Casares and Martin engaged in intimidation and abuse of processes against those

22

who challenged her schemes in furtherance of the conspiracy including in the fake complaints and investigation against Plaintiff, deliberately ignoring Plaintiff's much prior complaints against Namwamba in 2020, and failing to investigate discrimination complaints.

121.    Defendants Kairo and Allen acted in furtherance of the conspiracy to deny Plaintiff promotion to full professor despite the glowing recommendation for promotion issued by the university's own committee.

122.    Each action of each conspirator in furtherance of the conspiracy is imputed to all members of the conspiracy.

123.    As a result of Defendants' unlawful actions, Plaintiff has suffered economic and non-economic harm and compensable damages.

## COUNT 5: Civil Conspiracy to Retaliate for Asserting Freedom of Speech under the First Amendment to the US Constitution

124.    Plaintiff incorporates by reference the allegations in paragraphs above herein.

125.    Defendants engaged in a conspiracy to retaliate against Plaintiff for asserting her constitutionally protected freedom of speech. As detailed above, Plaintiff corrected Grace Namwamba's low-quality work, advocated for pay parity, campaigned for equal opportunities for all faculty especially women, and served on committees for better working conditions. These activities are in furtherance of her First Amendment rights under the US Constitution.

126.    Defendants conspired against Plaintiff and engaged in retaliation because they found her advocacy and association to be problematic for their unlawful activities of discrimination and creating a hostile working environment for non-Black faculty.

Defendants undertook meetings, plans, manufactured lies and fake complaints, abused university processes, and willfully violated tenure policies in retaliation.

127.    Defendants' actions caused economic and non-economic harm to Plaintiff that are compensable by damages and declaratory relief.

## COUNT 6: Defendants Deceptively and Fraudulently induced Plaintiff to Sign a Terminal Leave Agreement in violation of Maryland laws.

128.    Plaintiff incorporates by reference the allegations in paragraphs hereinabove.

129.    Defendants intentionally, deceptively, and fraudulently induced Plaintiff to sign a terminal leave agreement under the color of law by coercing her into believing she would be fired immediately.

130.    Defendants had already predetermined to fire Plaintiff even before the fake investigation and final report issued by Defendants Jason Casares and Alexandra Martin.

131.    Defendants concealed this fact and deceptively engaged in a fake investigation and issued a sanction of termination knowing full well that such a sanction violated UMES and USM policies and the Plaintiff's constitutionally protected rights.

132.    Defendants preyed on Plaintiff's extreme distress, anxiety, panic attacks, health conditions, and economic vulnerability to coerce her into signing a leave agreement when she had no prior intention to retire and when they knew that there was no legal basis to terminate her employment.

133.    Any reasonable person in the Defendants' position would have known that Casares and Martin had no authority to impose a sanction of termination. Any reasonable person in the Defendants' position would have known that they would have had to follow USM policies and the law governing the removal of tenured faculty. Despite this, Defendants

24

acted willfully and maliciously to fraudulently induce Plaintiff to sign an agreement when they knew she could not have offered informed consent.

134.    Defendants acted under the color of law, faked an investigation as a coercive device to induce extreme vulnerability, denied due process and meaningful opportunities to respond, concocted egregious lies and abused processes to intimidate and coerce Plaintiff.

135.    Plaintiff has suffered and continues to suffer economic and non-economic harm as a direct result of Defendants' unlawful acts.

## V.  PRAYER FOR RELIEF

Wherefore, Plaintiff Donna Satterlee respectfully requests a jury trial and that the Court enter judgment against Defendant and provide the Plaintiff with the following relief:

1.  An injunction ordering Defendants to rehire Plaintiff as a full professor at UMES with pay and benefits commensurate with her qualifications and experience;

2.  An order rescinding the terminal leave agreement as null and void and obtained by fraud;

3.  A declaratory judgment that Defendants' actions violated Title VII and the Plaintiff's constitutionally protected rights;

4.  A declaratory judgment that the individual Defendants engaged in a conspiracy to violate Plaintiff's rights;

5.  An injunction ordering the recovery of punitive damages from the individual Defendants in their personal capacities out of their personal funds for intentional and malicious violations of the Plaintiff's rights;

6. An order requiring Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, regardless of race and sex;

7. An order requiring the University System of Maryland to commence disciplinary proceedings against the individual Defendants;

8. Appropriate backpay with interest in an amount to be determined at trial for the pay discrimination and denial of promotion and related harms;

9. Punitive damages in an amount to be determined at trial for the egregious violations;

10. Fees and costs associated with litigation and any other relief that the court deems appropriate.

**Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A.

I agree to provide the Clerk's Office with any changes to my address where case- related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 23rd July **2025**.

Signature of Plaintiff ____Donna J Satterlee____

Printed Name of Plaintiff: Donna Jean Satterlee
30414 Oak Street
Princess Anne, Maryland 21853
phone 757-7100338
donnaj.satterlee@gmail.com

26