IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DONNA J. SATTERLEE, PH.D.<br><br>**Plaintiff**<br><br>v.<br><br>UNIVERSITY OF MARYLAND EASTERN SHORE,<br>HEIDI M. ANDERSON,<br>RONDALL ALLEN,<br>MOSES KAIRO,<br>GRACE NAMWAMBA,<br>JASON CASARES,<br>ALEXANDRA GINTA MARTIN<br>MATTHEW A. TAYLOR<br>JAY PERMAN<br>UNIVERSITY SYSTEM OF MARYLAND<br><br>**Defendants** | **Case No. 1:25-CV-2403-SAG** |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
AND MEMORANDUM OF LAW**

Plaintiff, Dr. Donna J. Satterlee ("Plaintiff" or "Satterlee"), by and through her undersigned counsel, David V. Diggs, Esq., and the Law Office of David V. Diggs, L.L.C., pursuant to Fed R. Civ. P. 12, comes before this Court and files this Response and Memorandum of Law, in opposition to the Defendants' Motion to Dismiss (the "Motion"), filed by University of Maryland Eastern Shore ("UMES"), University System of Maryland ("USM") (together referred to as "Institutional Defendants," where appropriate), Heidi Anderson, Rondall Allen, Moses Kairo, Grace Namwamba, Jason Casares, Alexandra Ginta Martin, Matthew Taylor, and Jay Perman (together referred to as "Individual Defendants," where appropriate).

1.    **INTRODUCTION**

The Plaintiff had a 22-year long career as a distinguished and popular educator at UMES. She was loved by her students and popular with her colleagues – exemplified by her holding elected leadership positions such as Secretary of the Faculty Assembly. Plaintiff performed her duties with integrity in accordance with the Higher Education Act and MSCHE Accreditation Standards. As alleged in the Complaint, Individual Defendants willfully and maliciously subverted federal and state laws and MSCHE Accreditation Standards for self-interested purposes to inflate enrollment and dupe the federal and state governments about student outcomes and the application of civil rights laws upon which federal funding was conditioned.

The Plaintiff repeatedly objected to Individual Defendants' actions, including egregious racial discrimination against Caucasian and Asian faculty in hiring, promotion, and pay. Plaintiff filed complaints about bullying by Grace Namwamba, her department chair, but the investigation was run by individual defendants who were all colluding on the scheme. Instead of honestly investigating her complaint of bullying, Individual Defendants concocted a fake complaint by her Supervisor, Grace Namwamba, that Plaintiff had bullied her. The alleged bullying consisted of Plaintiff correcting the English language usage by Namwamba. Based on this gossamer-thin allegation, Individual Defendants sought a far-fetched outcome: the termination of a tenured professor in violation of all applicable UMES and USM policies. Even if the allegations of bullying based on correcting Namwamba's English were true, they would not suffice to terminate a tenured professor in any USM institution. Holding this threat of termination over her head, Individual Defendants engaged in a sustained campaign against Plaintiff causing her immense mental and physical illness. Individual Defendants knew the severity of Plaintiff's mental illness caused by

their actions – they made her undergo psychiatric examination because her mental state was known to them to be unstable.

With full knowledge of her mental incapacity and financial vulnerability because she was the lowest paid faculty member in her department (and one of the lowest in UMES), Individual Defendants fraudulently induced Plaintiff to sign a terminal leave agreement. They were aware that it would be impossible to terminate Plaintiff's appointment as a tenured professor under prevailing law. What's more, Individual Defendants violated even the terms of the Transitional Terminal Leave Agreement ("TTLA") by not paying her the settlement amount and Heidi Anderson racially disparaging her publicly.

Plaintiff never intended to resign her position. She had every intention of continuing to teach and research and seeks reinstatement to her position through this Court.

Defendants fundamentally mischaracterize and misstate Plaintiff's Complaint and the applicable legal standards in their Motion to Dismiss. For reasons that follow, this Court should deny the Defendant's Motion to Dismiss.

## 2.    STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 12(b)(6), in order to survive a motion to dismiss a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The requirements of Fed. R. Civ. P. 8(a)(2) are only that the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... actual proof of those facts is improbable, and ... recovery is very remote and unlikely." *Twombly*, 550 US 554, at 556.

Pursuant to Fed. R. Civ. P. 12(b)(1), a party may move to dismiss a complaint for a lack of subject matter jurisdiction. "The district court should grant the Rule 12(b)(1) motion to dismiss 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 64 (4th Cir. 1999).

## 3.  THIS COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS

### a.  Plaintiff's Complaint Was Timely.

Defendants erroneously contend that Plaintiff's Complaint was filed after the 90-day period after the EEOC right to sue letter was received by her. This is manifestly false. As the Defendants admit, if the right to sue letter "is presumed to have been delivered on April 26, 2025," the 90-day deadline would have been July 25, 2025. Plaintiff filed her original Complaint on July 23, 2025, well within the deadline. Accordingly, Defendants' motion to dismiss must be denied on this ground.

### b.  Plaintiff's Complaint Pleads a Plausible Claim for Relief under Counts 1 and 2 (Title VII).

Under Title VII, in order to state a claim for discriminatory termination, Plaintiff must present facts demonstrating: (1) her membership in a protected class; (2) that she was terminated; (3) at the time of the termination, she was performing at a level that met the University's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant from outside her protected class. *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018) (citing *King v. Rumsfeld*, 328 F.3d 145, 148 (4th Cir. 2003)). It is only necessary to plead facts sufficient to support a reasonable inference that the adverse action was discriminatory.

Pursuant to Title VII, in order to state a claim for retaliatory termination, the plaintiff must allege facts showing that she participated in an activity protected under federal law or opposed an unlawful employment practice, and the employer subjected the plaintiff to an adverse employment action; and the plaintiff was subjected to the adverse employment action because of her participation in a protected activity or opposition to an unlawful employment practice.

A plaintiff is "subjected to an adverse employment action" because of her participation in a protected activity or opposition to an unlawful employment practice if the adverse employment action would not have occurred but for that participation or opposition.

The causation element may be inferred based on the proximity in time between the protected action and the retaliatory act "when there is a close proximity between the two." *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004).

Under Title VII, a hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022). A complaint must allege facts showing that the plaintiff (1) experienced unwelcome harassment; (2) the harassment was based on her protected status; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment; and (4) there is some basis for imposing liability on the University as her employer. *Id.*

In order to determine if harassment was "severe or pervasive," a court will look "at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *Perkins v. Internat'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019).

The Complaint recounts in great detail and specificity the numerous instances on which Defendants violated Title VII. These include but are not restricted to:

i.    Grace Namwamba exhibited a discriminatory preference for Black faculty by giving them higher pay and less work than non-Black faculty. ¶39.

ii.   Plaintiff was assigned "double the work," lowest pay, and unreasonably higher workload. ¶40

iii.  Dr. Satterlee was instructed by Dr. Namwamba to create a master's degree program in two days. ¶40.

iv.   Heidi Anderson operated a two-tier system of pay and preferential work conditions for Black faculty and staff and discriminated against others who possessed better qualifications.

v.    Dr. Satterlee advocated for race and gender-neutral pay and promotion based on merit as a faculty leader on numerous occasions. Her advocacy was on behalf of all employees and pay disparities were confirmed by a university-commissioned report. She complained on numerous occasions about pay and discriminatory working conditions. ¶28.

vi.   Namwamba took credit for Plaintiff's work and passed it off as her own. ¶40

vii.  Dr. Namwamba used workload allocation for punitive purposes in a malicious manner to harm Dr. Satterlee. ¶38-51.

viii. As one example, in November 2023, two weeks before the end of the semester, Dr. Namwamba tasked Satterlee with amending and updating the department's tenure policy document with a one-week deadline. At the same time, Satterlee was also tasked with

putting two classes online. Dr. Namwamba knew that Satterlee was already extremely busy with preparing her dossier for promotion and wanted to damage her application. ¶41

ix.    Namwamba consistently sought any excuse to terminate Dr. Satterlee's employment to hire a preferred African or African-American candidate. ¶42

x.    Plaintiff was given unsanitary workspaces, the worst office, and unsafe work conditions after her classroom and office flooded. There was mold in her office, sticky classroom flooring, whereas other Black faculty were given preferential treatment. ¶42

xi.    Dr. Satterlee repeatedly asked for her pay to be adjusted to bring it in line with other faculty of similar rank but was rebuffed. ¶48

xii.    Dr. Satterlee complained that Namwamba was not adhering to the USM rules and procedures related to student attendance and academic performance and raised these matters with Dr. Namwamba. Dr. Satterlee repeatedly emphasized the need to follow the Higher Education Act. ¶47-49

xiii.    Dr. Satterlee raised these issues with Dr. Namwamba on numerous occasions including during the Fall semester of 2021. Dr. Namwamba responded in a highly intimidatory manner causing extreme anxiety and leading Dr. Satterlee to make a note to report the matter to UMES Human Resources to obtain a protective order against Namwamba. ¶51

xiv.    On November 2, 2020, Dr. Satterlee met with Jason Casares and Alexandra Martin to make a complaint about bullying and hostile work environment created by Dr. Grace Namwamba. ¶52

xv.    During the meeting and the subsequent events, it was evident that Casares and Martin, who had a record of abusing investigations, were biased. ¶52-54

xvi.    In November 2021, Dr. Satterlee emailed Alexandra Martin and Jason Casares a complaint about Namwamba's hostile behavior and intimidation.¶56.

xvii.    On September 26, 2023, Dr. Satterlee emailed Jason Casares and informed him about bullying by Namwamba. ¶57

xviii.    On October 3, 2023, Dr. Satterlee emailed Alexandra Ginta Martin detailing trauma induced by Namwamba. The email stated, in part: "the topic of "trauma" is bringing up the trauma I had to deal with from Dr. Namwamba a year ago. ... am headed to the doctor later this morning. ... The ageism and racism from her right now is enough to deal with right now. She is trying to get me to retire."¶58

xix.    Dr. Namwamba deliberately withheld signatures on documents that were important to Dr. Satterlee to negatively impact her. For instance, signed performance evaluations for at least four years were not sent by Dr. Namwamba to prevent Dr. Satterlee from being able to use them in her promotion application or for other career advancement.¶60-61

xx.    On July 6, 2023, Heidi Anderson emailed Dr. Satterlee asking "When are you scheduled to retire?". This was in response to an email from Dr. Satterlee communicating concerns about Namwamba. ¶65

xxi.    Dr. Satterlee was asked to do the bulk of the work to prepare Human Ecology degree programs for online offering but was paid the lowest in the department.

xxii.    Heidi Anderson, Rondall Allen, Moses Kairo, and Grace Namwamba flouted the UMES Committee's recommendation to promote Plaintiff to full Professor for unlawful reasons. The committee wrote: "The Department of Human Ecology Ad Hoc committee has met as a whole and discussed Dr. Satterlee's application for promotion to the rank of Full

Professor. Her accomplishments were rated as follows: teaching (46.6 points/50), research and scholarly activities (16 points/30), and service (19.6 points/20). Dr. Donna Satterlee's overall accomplishment was rated as 82.2." ¶72

xxiii.    The Committee lauded Plaintiff's work in its recommendation for promotion. ¶73

xxiv.    Individual defendants acted with malice to deny promotion in retaliation.

xxv.    Namwamba met with Moses Kairo, Rondall Allen and Heidi Anderson to campaign for denial of promotion. In May 2024, Rondall Allen wrote to Heidi Anderson recommending denial of promotion based on invented scores that had no evidentiary support or reasoning. Allen cited Satterlee's lack of research publications – a fake rationale considering that it was a teaching department with no research expectations. ¶76.

xxvi.    Dr. Satterlee was denied promotion in 2024. She was the only applicant in that promotion cycle to be denied promotion. ¶75-78

xxvii.    Individual Defendants concocted a fake investigation alleging that Plaintiff "bullied" Namwamba because she corrected her English.

xxviii.    Even before the "Final Report" of this fake investigation from Jason Casares and Alexandra Martin recommending termination was issued, Grace Namwamba sent an email to Moses Kairo on May 23, 2024, with the subject line "Updated - Dr Donna Satterlee's Termination recommendation." ¶86-88

xxix.    The recommendation of termination before the investigation was completed exposes the conspiracy as a scam and an egregious violation of Title VII and due process protections.

xxx.    Defendants treated Dr. Satterlee differently than her African/African-American peers and applied standards that were different to those applied to Black faculty without any lawful basis and for discriminatory purposes.

xxxi. Dr. Satterlee's annual salary was substantially lower than that of her Black peers including Charlene Harris, Bridget Clinton, Tierra Tivis, Carla Sewer, Sarah Acquah, and Virginia Zoumenou. Despite being better qualified and better performing, she was paid less than these and other Black faculty.

xxxii. Dr. Satterlee was the only applicant who was denied promotion during the 2024 round of promotions. Defendants discriminated against her whilst promoting Black faculty including Patricia Goslee, Lakeisha Harris, and others who were of lower qualifications and performance.

Plaintiff alerted Defendants to the hostile work environment, unlawful violations of her rights, bullying, and discrimination repeatedly including to Jason Casares and Alexandra Martin starting in 2020. In addition, Plaintiff made specific complaints to Moses Kairo, Rondall Alen, and Heidi Anderson about Grace Namwamba but was ignored and her work conditions deteriorated. These individuals colluded with retaliatory animus to retaliate against the Plaintiff and terminate her employment in violation of the statute because they were already under pressure from adverse Department of Education/Justice Office of Civil Rights findings, adverse audit reports by the Office of Legislative Audits, and other investigations and wanted to avoid liability for their actions.

Defendant's Motion misconstrues the Complaint and errs in applying the pleading requirements of Fed. R. Civ. P Rule 8 (a)(2). This Court should deny the Defendants' Motion.

### c. Plaintiff's Claims Are Not Barred by The Transitional Terminal Leave Agreement.

Defendants' Motion misconstrues the Complaint and erroneously claims that Plaintiff "contractually waived" her right to sue them. As alleged repeatedly in the Complaint, Plaintiff had

no intention of resigning from her position. She was fraudulently and deceptively coerced into signing the TTLA when the Individual Defendants knew that she could not consent to any agreement to resign. They were aware of her unstable mental state -- indicated by their own action of seeking to involuntarily have the Plaintiff examined by a psychiatrist engaged by them. (See attached **EXHIBIT 1.**)

Logically, one can only waive something that one is aware of and cannot waive rights that one was deceived about. As detailed in the Complaint, the following sworn allegations by the Plaintiff plead against contractual waiver.

i.     Defendants had already predetermined to fire Plaintiff even before the fake investigation and final report issued by Defendants Jason Casares and Alexandra Martin.

ii.    Defendants concealed this fact and deceptively engaged in a fake investigation and issued a sanction of termination knowing full well that such a sanction violated UMES and USM policies and the Plaintiff's constitutionally protected rights without informing her of her rights. This is fraud.

iii.   Defendants preyed on Plaintiff's extreme distress, anxiety, panic attacks, health conditions, and economic vulnerability to coerce her into signing a leave agreement when she had no prior intention to retire and when they knew that there was no legal basis to terminate her employment.

iv.    Individual Defendants threatened Plaintiff that she would be fired summarily knowing that the threat had no legal basis but was likely to terrify the Plaintiff who would reasonably rely on those threats due to their supervisory power over her.

v. They did not advise her of the processes for terminating the employment of a tenured professor.

vi. They did not disclose the mandatory procedures to be followed for termination under UMES and USM policies.

vii. They did not even commence the termination procedures applicable for tenured faculty because they knew that it was impossible to fire Plaintiff based on their fake investigation into gossamer-thin allegations of bullying by Plaintiff's supervisor.

viii. They did not follow both the UMES and USM the termination procedures.

ix. They falsely deceived Plaintiff into believing that Jason Casares and Ginta Martin had the authority to terminate her.

x. The absence of any facts warranting termination in any USM institution for tenured faculty.

xi. The timely challenging of the sham investigation and the OIE "findings" by the Plaintiff.

xii. The termination whist the challenge was still live.

Defendants also falsely claim that Plaintiff did not pursue her administrative rights without a shred of evidence showing that they advised her of procedures for terminating tenured faculty, convened the necessary faculty hearing committees or that they obtained approval from the USM. Aside from the fact that the TTLA is void *ab initio*, it also fails due to subsequent breach by the Defendants who did not pay the sums mentioned, publicly disparaged the Plaintiff in the media and social media, and caused her financial, emotional, and health harms.

Defendants' citation of *Stone v. University of Maryland Medical System Corporation*, 855 F. 2d 167, 169 (4th Cir. 1988) severely damages their case. In that case, the employee was accused of medical malpractice – a serious offense – and his conduct was "legally and morally indefensible." Unfortunately for the Defendants, the facts are exactly the opposite here: Plaintiff

is a beloved teacher and colleague with 22 years of blemish-less service. She was lauded and recommended for promotion. To the contrary, Individual Defendants have long records of "morally and legally indefensible" conduct. For instance, Heidi Anderson is under investigation for plagiarizing her PhD dissertation. Jason Casares has been investigated for serious criminal law and civil law violations. There was absolutely no basis for Plaintiff to resign and she would never have done so absent the coercion, deception, and fraud by the Defendants. There was no legal basis for Plaintiff's termination under the USM policy governing tenured faculty and no process for such termination had been lawfully initiated. There was absolutely no basis for Plaintiff to give up her cherished job and Defendants have not shown any basis.

Plaintiff's Complaint has alleged sufficient facts to show that Dr. Satterlee did not waive any rights and did not voluntarily resign but was coerced, deceived, and fraudulently induced to sign the TTLA by the Defendants without having the capacity to consent. In any event, the TTLA was breached by the Defendants themselves, and they cannot rely on its terms.

> **d.    Plaintiff's Due Process and Conspiracy Claims Against Institutional Defendants are not Precluded by Sovereign Immunity.**

The Eleventh Amendment to the US Constitution states that the "judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

There are three exceptions: 1. Congress may abrogate such immunity when it unequivocally intends to do so and acts pursuant to a grant of constitutional authority; 2. suits are permissible for prospective injunctive relief against state officials acting in violation of federal law; and 3. a state may waive its Eleventh Amendment immunity.

Here, the Institutional Defendants are required as a condition for their existence to follow federal anti-discrimination laws. Both the USM and UMES would not be authorized to offer educational programs and receive Title IV funding from the US Department of Education absent a commitment to follow federal laws. In passing the Higher Education Act under which the federal financial aid programs are administered, Congress abrogated immunity for entities such as USM and UMES which are solely and primarily dependent on federal funding for their existence. The federal government has stated that in plain English. Virtually the entirety of UMES's operating revenues come from US federal funds administered by the Department of Education under Titles III and IV. Similarly, about 90% of all UMES research funds come from US federal grants.

Adhering to federal anti-discrimination laws, due process protections under the US Constitution, and laws including Title VI, Title VII, and Title IX are preconditions for UMES and USM without which they cannot exist. Title VI and Title IX allow agencies to enforce compliance via funding termination "or by any other means authorized by law." UMES can sue and be sued in its own capacity, is independent and not subject to meaningful state control, is entirely dependent on federal funds and authorization for its existence, and cannot claim Eleventh Amendment immunity.

Next, the *ex parte Young* exception applies. See *Ex Parte Young*, 209 US 123 (1908). In this Circuit, the court explained that "[r]einstatement is a form of prospective relief, [and]the refusal to provide that relief when it is requested can constitute an ongoing violation of federal law such that the *Ex Parte Young* exception applies." See, *Bland v. Roberts*, 730 F.3d 368,390 (4th Cir. 2013); see also *R. W v. Columbia Basin Coll.*, 77 F.4th 1214, 1226 (9th Cir. 2023 ("reinstatement is a form of prospective injunctive relief."); *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 322 (5th Cir. 2008) (noting "this circuit has always treated Ex parte Young as. an appropriate vehicle for

pursuing reinstatement to a previous job position," that "almost every circuit court has reached the same result."

As the Defendants well know, "[e]very circuit, including [the Fourth Circuit], has held that claims for reinstatement to previous employment meet the Ex Parte Young exception." See, *Biggs v. N. C. Dep 't of Pub. Safety*, 953 F.3d 236,243 (4th Cir. 2020).

Here, Plaintiff is seeking reinstatement to her tenured position. The claim is squarely covered by the ex parte Young exception and the Eleventh Amendment Immunity defense must be denied.

Finally, an alleged state entity may waive immunity by its litigation conduct. The USM has initiated suits against the federal government asserting various constitutional law claims in federal courts. It has thereby waived its immunity. The US Supreme Court explained in *Lapides v. Board of Regents of Univ. System of Georgia*, 535 US 613 (2002) that it "has established the general principle that a State's voluntary appearance in federal court amounts to a waiver of its Eleventh Amendment immunity, *Clark* v. *Barnard,* 108 U. S. 436,447; *Gardner* v. *New Jersey,* 329 U. S. 565, 574; *Gunter* v. *Atlantic Coast Line R. Co.,* 200 U. S. 273, 284, and has often cited with approval the cases embodying that principle, see, *e. g., College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U. S. 666, 681, n. 3. The principle enunciated in *Gunter, Gardner,* and *Clark* did not turn on the nature of the relief and is sound as applied to money damages cases such as this. And more recent cases requiring a clear indication of a State's intent to waive its immunity, *e. g., College Savings Bank,* 527 U. S., at 675-681, distinguished the kind of constructive waivers repudiated there from waivers effected by litigation conduct, *id.,* at 681, n. 3." The court decried the unfair outcomes from permitting state entities to tactically claim the benefit of the federal jurisdiction and the laws when convenient whilst pleading immunity when

the federal courts and laws might hold them liable. It said, "adopting respondents' position would permit States to achieve unfair tactical advantages, if not in this case, then in others, see *Wisconsin Dept. of Corrections* v. *Schacht,* 524 U. S. 381, 393-394, the rationale for applying the general principle is as strong here as elsewhere. Respondents also argue that Georgia is entitled to immunity because state law does not authorize its attorney general to waive Eleventh Amendment immunity and because, in *Ford Motor Co.* v. *Department of Treasury of Ind.,* 323 U. S. 459, a State regained immunity by showing such lack of authority-even after the State had litigated the case against it. Here, however, Georgia *voluntarily* invoked the federal court's jurisdiction." *Id.* Similarly, USM invoked federal court jurisdiction and must be held to have waived its immunity.

**e.    Plaintiff's Claims Against Individual Defendants Are Not Barred by Eleventh Amendment Immunity.**

The Eleventh Amendment does not immunize the unlawful actions of individual defendants. They are neither a state nor a state entity and therefore not entitled to Eleventh Amendment immunity.

**f.    Individual Defendants Are Not Entitled to Qualified Immunity.**

Defendants mistakenly claim that the "facts alleged by Dr. Satterlee do not establish a violation of her right to due process."

As explained by the recent case of *Wells v. Fuentes,* No.23-1638 (4th Cir., 2025), "Qualified-immunity cases involve two steps. At step one, the plaintiff pleads a § 1983 or Bivens action by showing that an official's conduct violated his right. *See Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). At step two, qualified immunity allows the official to beat the plaintiff's claim by showing that the asserted right was less than "clearly established" at the time of the conduct. *Plumhoff v. Richard,* 572 U.S. 765, 778 (2014)." *Id.* at 11. The court reasoned that "clearly established" means

"any reasonable official in the defendant's shoes would have understood that he was violating it."
*Plumhoff*, at 779.

Plaintiff has provided a thorough recitation of facts showing that Individual Defendants violated her constitutional rights, including, in addition to those asserted hereinbefore:

i. Heidi Anderson has instituted a two-tier system of racial preferences discriminating against White and Asian faculty who are given more and less-desirable work but significantly lower pay.

ii. Heidi Anderson's two-tiered system is invidiously and maliciously organized racism: it exploits White and Asian faculty's work and transfers credit and income generated from that work to selected Blacks in the form of inflated pay and bribes. White and Asian faculty are treated as second-class citizens at UMES.

iii. Retaliation against Dr. Donna Satterlee because she was a leader of a campus effort to achieve non-discriminatory pay and promotion opportunities for all employees at UMES.

iv. Plaintiff and others have brought to Perman and the USM's attention serious violations of legal duties, systematic discrimination, bullying, harassment, and potentially criminal activities by Heidi Anderson and her associates. Perman has ignored these reports.

v. Grace Namwamba exhibited a discriminatory preference for Black faculty by giving them higher pay and less work than non-Black faculty.

vi. Dr. Satterlee was frequently assigned work at the last minute, given teaching allocations without adequate time for preparation, and was assigned double the work of African or African-American faculty. Dr. Satterlee was instructed by Dr. Namwamba to create a master's degree program in two days.

vii. Namwamba took Plaintiff's work and denied her credit for career progression.

viii.   Namwamba wanted to terminate Dr. Satterlee's employment to hire a preferred African or African-American candidate. She was given unsanitary workspaces, the worst office, and unsafe work conditions after her classroom and office flooded. There was mold in her office, sticky classroom flooring, whereas other Black faculty were given preferential treatment.

ix.   Dr. Satterlee was the lowest paid member of her department for no valid reason.

x.   Dr. Satterlee brought her complaints about Grace Namwamba to the attention of Gertrude Hairston, director of Human Resources, and Matthew Taylor, General Counsel.

xi.   In November 2021, Dr. Satterlee emailed Alexandra Martin and Jason Casares a complaint about Namwamba's bullying.

xii.   Dr. Namwamba deliberately withheld signatures on documents that were important to Dr. Satterlee to discriminate against her.

xiii.   Kairo, Allen, and Anderson signaled their strong support for Namwamba publicly at Faculty Assembly and Senate meetings, paid her substantially more than similar professionals at other universities.

xiv.   Defendants ganged up to fabricate a fake allegation of bullying, did not follow due process, and recommended termination of Plaintiff's employment even before their fake investigation was completed.

xv.   Defendants did not follow due process protections and procedures mandated for the termination of tenured faculty.

xvi.   Defendants violated USM Policies including those publicly available at University Policies | UMD | Faculty: Microsoft Word - BOR Edits - Section II-1.04 - 12.12.14.doc

xvii.  Defendants unlawfully denied Plaintiff promotion in violation of UMES policies and faculty recommendations.

xviii.  Plaintiff was the only person to be denied promotion whereas specifically named Black faculty of similar or lesser qualifications were promoted.

xix.  In May 2024, Rondall Allen wrote to Heidi Anderson recommending denial of promotion based on invented scores that had no evidentiary support or reasoning. Allen cited Satterlee's lack of research publications – a fake rationale considering that it was a teaching department with no research reputation or record.

xx.  Heidi Anderson, Rondall Allen, Moses Kairo, Grace Namwamba, Jason Casares, Matthew Taylor, and Alexandra Martin used the unlawful threat of termination in their "Final Report" to coerce Dr. Satterlee to "resign." This was nothing but constructive dismissal achieved unlawfully. Dr. Satterlee's employment ended on December 14, 2024, pursuant to a coerced and fraudulently induced "Transitional Terminal Leave Agreement.

xxi.  Grace Namwamba sent an email to Moses Kairo on May 23, 2024, with the subject line "Updated - Dr Donna Satterlee's Termination recommendation."

xxii.  This email was sent months before the supposed impartial investigation that was to be the basis for any sanction by UMES showing that the investigation was a scam and Plaintiff was not granted due process.

xxiii.  The existence of the May 23 email from Grace Namwamba proves that the OIE investigation by Jason Casares and Alexndra Martin was a fraud and a violation of due process. The outcome was predetermined by Namwamba, Kairo, Anderson, Casares, Taylor, and Martin and the Final Report was a scam.

Here, Plaintiff has alleged facts to show that she could not have been terminated even if the investigation's findings were true – which they were not. The fact that the termination predated the investigation report shows that Defendants knew they had no valid basis to terminate her. Moreover, Defendants are on notice about the applicable UMES and USM policies governing termination of tenured faculty which prescribe onerous procedures. Individual Defendants did not even pretend to initiate such procedures because they knew they could not fire Plaintiff for advocating for pay equality, anti-discrimination, stopping fraud, and whistleblowing about their corrupt acts. The right to not be fired without following USM policies and the due protections mandated are clearly established and well known by the Defendants subjectively and objectively. Similarly, the right to be free from discrimination on the basis of race and gender in public employment are well established, and defendants know that they cannot pay Plaintiff less than faculty of comparable standing as they did repeatedly.

### g.    Defendants Erroneous Resort to the Intra-Corporate Conspiracy Doctrine Must Fail.

Defendants wholly misconstrue the Complaint's conspiracy claims against Individual Defendants and assert the intra-corporate conspiracy doctrine for the proposition that a corporation cannot conspire against itself and the acts of an agent are the acts of the corporation.

Unfortunately for the Defendants, their argument is fallacious. As a doctrine stemming from agency law, it can only insulate acts undertaken by an agent within the scope of her duties. An agent acting beyond the scope of employment or ultra vires is not protected and two such agents can conspire with each other. *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). Courts have held that where agents have a "personal stake" in the matter, the doctrine does not apply. *Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1326 (11th Cir. 2004).

Namwamba, Heidi Anderson, Moses Kairo, Jason Casares, Matthew Taylor, Jay Perman and Alexandra Ginta Martin all had a personal stake in violating the Plaintiff's constitutional and civil law rights. The personal stake, as recounted numerous times in the Complaint included:

i.    Anderson's goal to maintain a discriminatory two-tier structure at UMES;

ii.   Jay Perman's personal close relationship with Anderson and his repeated cover-ups of complaints against Anderson including those detailed by the media articles published in the Washington Post, Baltimore Sun, Baltimore Banner, and the Daily Wire, which are on the public record for the Court to take judicial notice of.

iii.  Jay Perman's personal stake in protecting his high salary by tricking regulators into believing his performance was satisfactory.

iv.   Jay Perman's personal interest in paying Anderson an unparalleled salary and benefits despite a terrible performance record due to his friendship with her dating back to their years in Kentucky.

v.    Jason Casares's hiring and retention as an enforcer for Anderson's schemes despite his problematic record.

vi.   Heidi Anderson promoted Casares and Martin and awarded them vastly exaggerated salaries in exchange for their participation in conspiracies to violate Plaintiff's rights. Casares, Taylor, and Martin engaged in intimidation and abuse of processes against those who challenged her schemes in furtherance of the conspiracy including in the fake complaints and investigation against Plaintiff, deliberately ignoring Plaintiff's much prior complaints against Namwamba in 2020, and failing to investigate discrimination complaints.

vii.   Namwamba undertook malicious actions including writing false allegations, intimidating Plaintiff, orchestrating a denial of promotion and termination campaign in furtherance of the conspiracy to terminate Plaintiff's employment.

viii.   Kairo and Allen served at the pleasure of Anderson and denied Plaintiff promotion to full professor despite the glowing recommendation for promotion issued by the university's own committee based on their personal stake in preserving undeserved roles with high pay.

ix.   Alexandra Martin's personal stake in violating the laws as a condition for preserving her job.

x.   All individual defendants desire to escape investigation by the Department of Justice and Department of Education's Offices of Civil Rights which had previously ruled that UMES and other USM institutions were responsible for serious violations.

xi.   Namwamba and Moses Kairo's personal stake in hiring Africans.

xii.   Anderson and Allen's personal stake in maintaining an artificially inflated enrollment number, fake student outcomes, and their interest to reward cronies who maintain their schemes from being exposed and thereby to escape accountability from regulators.

xiii.   All individual defendants had a personal stake in projecting a false and deceptive image that UMES was not engaging in serious corruption, covering up a 17% 4-year graduation rate, and the fact that the average graduate earned about the same as a high school graduate. Exposure of these facts would have triggered investigations and loss of unmerited pay.

The Plaintiff's advocacy and exposure of the truth gave rise to the conspiracy to terminate her from her job, through the meetings and communications enumerated in the complaint and the overt acts of promotion denial and termination.

Page **22** of 26

Accordingly, Defendants' motion must be denied on the intra-corporate conspiracy doctrine as it is inapplicable to the Individual Defendants.

    **h.    This Court Has Subject Matter Jurisdiction over Fraud and Tort Claims.**

As noted previously, Defendants' arguments about Eleventh Amendment immunity must be denied because such immunity does not exist for both the institutional and individual defendants.

This Court has supplemental jurisdiction under 28 USC 1367 (a). All federal claims alleged are properly pleaded and survive a motion to dismiss.

Regarding the negligent hiring and supervision counts, the Plaintiff's Complaint shows that:

i.    USM was notified about organized cover up in various USM institutions under Jay Perman. For instance, the highly publicized sexual assault scandal at UMBC was exposed by a Department of Justice investigation that revealed extensive cover up and refusal to properly investigate and punish wrongdoing. This pattern is repeated at every USM institution under Perman. USM Regents were on notice about numerous allegations of corruption and waste under Perman, his specific fondness for Anderson, and his inability to perform his duties objectively without causing harm to faculty, staff and students. ¶31, 32.

ii.    Jay Perman was notified about serious illegal acts by Heidi Anderson by whistleblowers including the former head of Human Resources of UMES. ¶33.

iii.    Jay Perman was notified of adverse audit findings concerning corrupt spending by Heidi Anderson.

iv.   Jay Perman was notified about adverse actions relating to the misuse of grant funds by Heidi Anderson, Rondall Allen and Moses Kairo by federal and state regulators including the Department of Agriculture, Department of Education, Department of Commerce, NASA, and the NSF.

v.   Jay Perman and Heidi Anderson were on notice about serious illegal acts including sexual assault and abuses of investigations by Jason Casares because these were publicly exposed by the media including the local ABC news station. ¶35 et seq.

vi.   Jay Perman and Heidi Anderson were notified about illegal activities conducted by Jason Casares and Alexandra Martin by numerous faculty and staff of UMES. ¶36-37.

vii.   Matthew Taylor was notified about illegal discriminatory practices in pay, promotion, and hiring.

viii.   Moses Kairo was notified by numerous faculty members about bullying and hostile work environment created by Grace Namwamba.

Individual Defendants were aware of the risk of harm posed by the hiring and retention of Perman, Anderson, Allen, Kairo, Taylor, Casares, Namwamba and Ginta Martin both based on their prior known work records, and their subsequent work performance. As public institutions, defendants had a duty of care to Plaintiff, students, faculty and staff. Defendants failed to supervise or terminate these individual defendants despite serious allegations of wrongdoing – silencing whistleblowers and intimidating reporters. Perman denied all complaints and pretended that there was no need to supervise subordinates. He has publicly claimed Anderson needs to be supported despite serious allegations of misconduct reported by the media against her. The Court can take judicial notice of these public facts. The Defendants' failure to supervise and discipline directly

caused the Plaintiff to lose her job. If the Defendants had exercised proper control over these wrongdoers, they would not have brazenly violated Plaintiff's rights and caused her severe harm. Accordingly, Plaintiff has more than met the pleading requirements for these counts and the Defendants' Motion to Dismiss must be denied. The Plaintiff's Affidavit is simultaneously being filed with the instant Response as **EXHIBIT 2**.

## 4.    CONCLUSION

In their Motion to Dismiss, the Defendants' have grossly mischaracterized the Plaintiff's Complaint and, for all the reasons set forth above, their Motion must be denied.

Respectfully submitted,

January 10, 2026
Date

David V. Diggs, Esq., Federal Bar # 06217
Law Office of David V. Diggs, LLC
8684 Veterans Highway, Suite 302
Millersville, Maryland 21108
(410) 244-1189
(443) 543-6360 (Fax)
david@diggslaw.com
*Attorneys for Plaintiff*

https://.../CASES/CIVIL/Satterlee 2/Response Motion Dismiss filed 26.1.10.docx

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of January 2026, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system and was served via the CM/ECF upon:

Jennifer A. DeRose, Esq.
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore MD 21202
Jderose@oag.state.md.us
*Attorneys for the Defendants*

David V. Diggs, Esq., Federal Bar # 06217
Law Office of David V. Diggs, LLC
8684 Veterans Highway, Suite 302
Millersville, Maryland 21108
(410) 244-1189
(443) 543-6360 (Fax)
david@diggslaw.com
*Attorneys for Plaintiff*